27 C.C.P.A. (Patents)

### RAICHE v. FOLEY.
**Patent Appeal No. 4307.**

Court of Customs and Patent Appeals.

July 8, 1940

Rehearing Denied Sept. 30, 1940.

498

Karl Fenning, of Washington, D. C., for appellant.

Willis F. Avery, of Akron, Ohio (Hoke S. Woodruff, of Akron, Ohio, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office, reversing the decision of the Examiner of Interferences, in an interference proceeding of which the latter tribunal said: "The subject matter in issue is a process which, as disclosed by the parties, finds specific application in the manufacture of integral one-piece distensible bag catheters."

The interference, which embraces seven counts (all being method counts), was declared between a patent No. 2,043,630, issued to Raiche June 9, 1936, upon an application filed November 9, 1935, and an application of Foley, filed October 1, 1936. The counts are identical with claims 5 to 11, inclusive, of the Raiche patent and were set forth as claims 5 to 11, inclusive, in Foley's application as filed.

Since Foley's application was filed after the patent to Raiche issued, the burden rested upon Foley to establish priority beyond a reasonable doubt.

A phase of the case relating to a question of practice and not involving the merits was brought before us by a former appeal and decided. See Raiche v. Foley, 103 F.2d 920, 26 C.C.P.A., Patents, 1235.

There has been injected into the present appeal a question relating to Raiche's right to amend his original reasons of appeal after the same had been perfected in the Patent Office. The question so injected was specially briefed by counsel for the respective parties, at the request of the court, it being determined that it would be taken in connection with the argument upon the merits, the necessity of its consideration by us being dependent upon the conclusion which we should reach respecting the merits upon the basis of the original reasons.

The patent to Raiche bears the broad title "Construction of Rubber Articles." The application of Foley is entitled "For Method of Making Rubber Articles."

The counts are quite broad, and the specific application of them to distensible bag catheters is determinable only from an inspection of the respective specifications. The Examiner of Interferences quoted counts 1 and 2 as typical, and we follow his example in that respect:

"1. The method of forming articles with wall recesses, comprising the steps of coating a form, placing a passageway form on the coated form, coating the first and second forms, locally treating the coated area about the end of the passageway form to prevent surface adhesion, again coating both forms and their coats, and removing both forms, whereby an integral article having a recess with a communicating passageway is obtained.

"2. The method of forming articles with wall recesses, comprising the steps of dipping a form in coating solution, placing a passageway form on the coated form, dipping the first and second forms, locally treating the coated area about the end of the passageway form to prevent surface adhesion, again dipping both forms and their coats, and removing both forms, whereby an integral article having a recess with a communicating passageway is obtained."

It will be observed that there is no mention of rubber in either of the above counts. It may be stated that the same is true of all the other counts except count 7, which reads: "7. The method of forming articles, comprising coating a form with a solution of rubber material, to form an initial coat, treating a local area of the initial coat to prevent surface adhesion, and again coating the coated treated form with a solution of rubber material, whereby an integral article with a recess results."

The board did not quote any count.

Both parties took testimony. We do not find in either of the decisions below any specific reference to the dates claimed in the respective preliminary statements. The Examiner of Interferences reviewed only the testimonial record filed on be-

half of Foley, being of the opinion that it was unnecessary to consider the Raiche record in view of his holding that Foley "failed to establish inventive acts overcoming the record date" of Raiche.

The board held that Foley "had a conception as early as 1934" and that, in letters of March 25, 1935 and April 4, 1935 (hereinafter more particularly set forth) he "suggested the steps of the process." The board did not assign any date for Foley's reduction to practice, nor did it discuss the question of Foley's diligence. It may be said also that it did not discuss Raiche's record.

It appears that Dr. Foley is a surgeon specializing in the field of urology. In his preliminary statement he claimed conception of the invention "sometime in the early part of 1929" with reduction to practice "on or about September 15, 1931." It is clear that these claimed dates must be disregarded because whatever work Dr. Foley may have done at those times did not involve the process required by the counts.

The following statement from the decision of the Examiner of Interferences, which was not questioned in the decision of the board, is helpful in elucidating the history of Dr. Foley's activities: "It appears that in connection with certain cystoscopic procedures some difficulty is experienced in controlling post-operative hemorrhage and that for this purpose Foley attached a rubber bag to the lower end of the conventional catheter, which bag was inflated by means of a small auxiliary tube. The small inflated bag, pressing against the affected area, serves to check and control the flow of blood. Catheters of this type were not made commercially prior to 1935, and Foley made those which he used by an assembly method, thin rubber sheeting being cemented to the lower portion of a conventional catheter in the manner described in Foley's exhibit A."

We may say at this point that we have no doubt that Foley, probably as early as the dates named, recognized the desirability of having an improved catheter for use in his special field of practice, and that, from time to time, he gave some study and attention to the problem of producing such an instrument. His early efforts were to produce one by the "assembly" method, that is, by cementing rubber sheeting to the lower portion of a conventional catheter, and, even after he had learned, in 1932, the use of liquid latex for forming dipped rubber articles, he continued until 1935 trying to find a commercial manufacturer who could make a satisfactory catheter by the assembly method. This fact was regarded as significant by the Examiner of Interferences, who commented as follows: "If, in fact, Foley had seriously contemplated the making of hemostatic bag catheters by a dip method from latex or any other suitable form of rubber it does not seem reasonable that he should have failed to include such suggestion in these negotiations."

As has been stated, the board awarded Foley conception "as early as 1934," and the brief on his behalf before us does not seriously claim any date earlier than June, 1934. The award by the board and the claim of the brief is based upon the testimony of Dr. Ward L. Beebe and Dr. Phillip F. Donahue. The Examiner of Interferences made no specific reference to this testimony. We presume it to have been his view that the testimony did not establish conception as of that time, or that, if it did, Foley had failed to establish the requisite diligence. However that may be, he did not discuss the testimony and, for reasons which later will appear, we deem its discussion unnecessary here.

Another date of conception claimed on behalf of Foley in the brief before us is that of March 25, 1935, and the brief emphasizes this more strongly than it does the "as early as 1934" date awarded by the board. The claim for March 25, 1935, is based upon a letter written under that date by Foley to one R. W. Albright, general manager of American Anode, Inc., of Akron, Ohio, an organization, according to Albright's testimony, devoted to the development and research of latex compositions, latex processes, etc., including articles utilized in the surgical profession.

It appears that there had been some prior correspondence between Foley and Albright. In a letter dated March 16, 1935, Foley requested "a supply of latex rubber" solution, stating therein that he would appreciate any literature describing latex, particularly anything "bearing on production methods, curing and properties in general." It appears from Albright's testimony that a gallon of "standard American Anode mix" was sent on or about March 18, 1935, on which date Albright wrote him that it was being sent, adding, in substance, that the com-

pany would be pleased to work with him (Foley) on any problem he had in mind in which the company's experience and background might be of assistance in developing any particular rubber article.

The letter of Foley, under date of March 25, 1935, was in answer to the letter of Albright and, in view of the emphasis placed upon it, we quote its text in full:

"My dear Mr. Albright:

"It was a pleasure to have your curteous [courteous] and helpful letter of March eighteenth. For the past three or four years Mr. Wallerich of the V. Mueller Surgical Instrument Company of Chicago and I have been trying to find among the rubber manufacturers, something like your spirit of cooperation but without success—and so your letter is particularly gratifying. I certainly appreciate your offered assistance and taking you at your word I will tell you our problem—and now with confidence it will be worked out.

"We have been trying to have produced for the market a special form of catheter for use in connection with the operation of removing the prostate gland. The catheter serves two purposes following the operation; it provides drainage of urine from the bladder and at the same time controls bleeding from the surfaces from which the gland has been excised. The latter is accomplished by a distendable elastic bag surrounding a segment of the catheter just below the eyelets, the bag lying in contact with the cavity from which the gland has been removed. During introduction and removal of the catheter the bag of course, must be colapsed [collapsed].

"I am sending you herewith a reprint of a paper I published in the Journal of Urology in which the device was first described—pages 295 and 302. As you can see, the original improvised product was pretty crude. The small catheter, size F8, within the lumen of the larger one interfered with drainage and was particularly troublesome when the drainage became impeded by blood clots. The dipped elastic bag was cumbersome and cementing it to the catheter wall was very troublesome.

"Later we tried to get American manufacturers and finally Eynard of Paris to produce a more finished device but without success. However, we did get from Eynard a catheter with groove in its wall in which to imbed and cement in place a small distending tube. To assemble the catheter, bag and distending tube was time consuming and troublesome but I made for my own use a number of these and proved the great usefulness of the device in numerous operations.

"Some time ago the V. Mueller Company took the problem up with a German manufacturer. We just got a sample of their attempt and for your interest—or amusement—I am sending you one of these. Please return it.

"Not knowing that anywhere in the world there was a person like you ready to undertake such a thing and more or less in desperation, I have been experimenting with Latex trying to satisfy myself that a practical method for making the device in one piece can be worked out. The plan I have started with is described in the enclosed crude sketches and notes. Up to the point of dipping the bag, which I am now doing, it has gone fairly well though looks pretty crude by comparison with the work of an artisan. I am looking forward with interest to see how the bag will come out.

"I am sending you herewith three sizes of the ordinary drainage catheters that we use following the operation. The consistency, the length, size of lumen, outside diameter, position of eyelets and pocket in tip of these *cahteters* all are most appropriate. Of course when such a catheter is used providing no means for control of bleeding, bleeding points must be sealed by an electric spark at the time of operation. Necrosis of tissue incident to this is one of the bad features of the operation in its present form. All we need is the bag and distending duct on a catheter of this form. The bag should be about the same thickness as the sample glove finger enclosed.

"In considering the matter it should be borne in mind that the special purpose and important use of the device makes the price it would have to sell for relatively unimportant—that is from three to five dollars a piece.

"Again my thanks for your helpful and encouraging letter.

"I trust I may hear from you at your early convenience.

"Sincerely yours,
"(Signed). Frederic E. B. Foley
Frederic E. B. Foley, M. D.
"febf/em.

"P. S. If per chance you undertake the making of a sample, I would suggest the size F24."

We reproduce also photostatic copy of the sketch that accompanied the letter as same appears of record:

It is claimed for Foley that the descriptive matter in the letter and the sketch constitutes a complete disclosure of the subject matter of the counts, count 2, supra, being analyzed in connection therewith.

No. 4307 Patent Appeal Docket

Foley Exhibit E4

At this point it is proper to direct special attention to the provision of the counts requiring a treatment to prevent adhesion of the several coats for forming a distensible portion in the wall of the catheter. It will be noted that in the descriptive note following Fig. IV of the sketch reproduced, supra, it was stated, in substance, that for this purpose a piece of tin foil was wrapped around a segment of the catheter, which tin foil was later to be dissolved out by the use of hydrochloric acid, and the note adds, "No doubt a material and method for this purpose more appropriate than the tin foil and this method are in regular use in Latex technique."

It is obvious that preventing adhesion in order to form a distensible portion in the wall of the catheter is a crucial—in a sense *the* crucial—feature of the invention. The counts do not specify any particular material to be inserted and subsequently dissolved out for producing this effect but, clearly, unless Foley had a conception of a practical material which would work successfully, conception in that regard was not complete.

It is, therefore, important to examine the record closely upon this point. It is not shown that the American Anode Company when sending the latex offered any suggestion respecting the matter, but it appears that after Foley had received the latex he tried to make catheters by the proposed dip method. Under date of April 4, 1935, he wrote Albright a letter, from which the Examiner of Interferences (supplying the italics) quoted as follows: "At the present time I am trying to build two catheters *sufficiently good for actual use.* Thus far they look fairly promising. Instead of the tinfoil as separating medium, I'm going to use shellac which can be dissolved out of the bag with alcohol. From experiment, this seems to work all right, but I *wish you would tell me what is the proper substance to use for such purpose.* In making the enclosed sample I used tinfoil."

After quoting the foregoing the Examiner of Interferences continued:

"The sample referred to was not preserved and apparently was unsatisfactory because of difficulty incident to the removal of the tinfoil separating material.

"American Anode's reply to Foley's letter of April 6 is in evidence as exhibit G. With respect to Foley's suggestion of shellac and tinfoil to separate the layers of rubber, the writer stated:

" 'I would suggest that shellac which can be dissolved out of the bag with alcohol would be more satisfactory than tin foil and it is along this line that we are working.'

"It may be noted that this letter does not describe 'this line' however, nor is any answer made to Foley's specific request for information concerning 'the proper substance to use for such purpose'.

"Then on April 16, 1935, Foley submitted the two samples referred to in his previous letter of April 8. These were not 'sufficiently good for actual use', as an inspection of exhibits I and J shows that the removal of separating materials, shellac and collodion respectively, resulted in destruction of the bag portion of the catheter. From Foley's letter, exhibit H, it is manifest that at the time Foley was fully aware that his suggestions for separating materials were unsuitable. Thus, Foley wrote:

" 'For your interest or amusement perhaps, I am sending you herewith my two attempts at building a catheter for actual use and as you will see, neither one was eminently satisfactory. * * * The further difficulty with this attempt was my use of shellac as a separating medium. I found it impossible to completely dissolve it with alcohol according to my particular technique for the shellac seemed to gather up some of the rubber and the alcohol only converted it into an insoluble doughy mass. With the other sample I used collodion as a separating medium * * * but * * * the ether used in dissolving the collodion ruined the rubber. * * *

" 'I would be very much interested in seeing a sample of what you have been able to produce.' "

Foley's letter of March 25, 1935, was placed in the hands of Mr. Robert A. Lees, a chemist employed by American Anode, Inc., whose business was the development of surgical appliances, especially catheters, with instructions to make some catheters for Dr. Foley.

Lees testified at length respecting his activities concerning the matter covering a period extending from April, 1935 to July, 1935. He stated: "I would esti-

mate that about fifty to seventy-five per cent of my work done during this period was devoted to the Foley hemostatic bag catheter problem" and that "Some work was done on this problem every working day throughout this period." He had, however, made samples which were displayed at the meetings of the American Medical Association and American Urological Society in June 1935.

The testimony of Lees relating to what he did respecting the methods pursued by him in developing the catheter is quite elaborate, details being extensively recited. We deem it unnecessary to state these details at length, because we are of the opinion that Foley must be denied conception of that feature or step of the counts relating to the prevention of surface adhesion for the formation of a distensible portion in the wall of the catheter, which, as we have said, is the crucial feature of the invention. Foley, of course, understood, that this was a problem which must be solved by including a separating material that could be dissolved out of the structure at the proper time, but we are unable to agree that the record shows beyond a reasonable doubt that he ever conceived of a material which satisfied this requirement. He suggested various materials and Lees seems to have experimented with at least some of them, but all of them were abandoned before any satisfactory catheter was developed, and Lees himself, without any suggestion from Foley, substituted for them a 1% solution of ethyl cellulose in alcohol, the cellulose film removable by flushing with alcohol. The statements of Foley, fairly contrued, in our opinion, clearly show that he fully recognized his own failure definitely to suggest the means for its solution.

A question of law is presented concerning which, it has been suggested, the Examiner of Interferences and the board differed. The former in discussing the question of Foley's diligence said: "* * even if it be assumed that Foley had conceived the invention prior to May of 1935, he must fail for lack of diligence in filing his involved application. Whatever Lees did was done for his employer, the American Anode Company and not on behalf of or under the direction of Foley. Except for a general statement in exhibit G that American Anode was working along this line, no information was given to Foley concerning that company's experiments or processes."

At another point the Examiner of Interferences in holding that Foley had failed to establish an actual reduction to practice on any date said: "* * * Regardless of whether or not Lees' work for the American Anode Company constituted a satisfactory performance of the process defined in the counts in issue it cannot inure to the benefit of Foley in the absence of proof that Foley had conceived the complete and operative process and that Lees was acting merely as his agent in carrying out his directions."

■ The board disagreed with the Examiner of Interferences upon this point but we think the fair construction of its holding relative thereto is based upon its conclusion that Foley had a complete conception which Lees embodied in a device. If we were in agreement with the board as to the fact of Foley's conception, we should also agree with it upon the question of law. That is to say, if Lees had, in fact, embodied the actual *conception* of Foley in a satisfactory device, we think the relationship created by the correspondence between Foley and Albright was such that Foley would have been entitled to the benefit of Lees' work in considering the question of *reduction to practice*. We do not think, however, that this rule applies to conception; that is, under circumstances such as here exist, Foley cannot be credited with complete conception since one of the vital elements of the method defined in the counts was the discovery of Lees.

■ Upon the question of reduction to practice, we deem it not improper to say that there is no showing in the record that the catheter made by Lees by the method which he employed was ever actually used upon a patient and that we are unable to agree with the contention in the brief on behalf of Foley that Foley personally reduced the invention to practice as early as April 16, 1935. This was not possible if our view that he did not have conception on that date be correct.

Upon the facts as we find them relating to absence of conception on the part of Foley, the question of his diligence is not involved.

As was stated earlier in this opinion, a question relating to Raiche's right to

amend his reasons of appeal after the appeal to this court had been perfected was injected into the case and made the subject of special briefs for which the court is indebted to counsel. The question so raised is an interesting one and, under some circumstances, might be of great importance. Being unable at the time it first was brought into the instant case to determine what its importance might be here, we took the course which has been recited. Since the original reasons of appeal present a sufficient basis for a decision of the case, it is unnecessary to indulge in obiter dictum by discussing and passing upon the injected questions.

For the reasons stated, the decision of the board is reversed, and priority awarded to the party Raiche.

Reversed.

LENROOT, Associate Judge, did not participate in the decision of this case.