56 CCPA

**Erich F. MEITZNER and James A. Oline, Appellants,**

v.

**Herbert CORTE and Alfred Meyer, Appellees.**

**Patent Appeal No. 8081.**

United States Court of Customs and Patent Appeals.

May 15, 1969.

Harold J. Birch, Donald C. Simpson, Irons, Birch, Swindler & McKie, Washington, D. C., George W. F. Simmons, Rohm and Haas Company, Philadelphia, Pa., attorneys of record, for appellants.

Connolly & Hutz, Wilmington, Del., for appellees. Earl Christensen, Wilmington, Del., of counsel.

Before WORLEY, Chief Judge, KIRKPATRICK, Judge, sitting by designation, RICH, ALMOND and BALDWIN, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Patent Interferences awarding priority to Corte and Meyer in interference No. 92,816, involving Corte and Meyer (Corte et al.) application serial No. 718,989, filed March 4, 1958, entitled "Anion Exchanger With Sponge Structure" and Meitzner and Oline (Meitzner et al.) application serial No. 749,526, filed July 18, 1958, entitled "Polymerization Processes and Products Therefrom."

Corte et al., senior party, rely on the filing date of their German application, March 9, 1957; their right to this date has not been challenged. Having the burden of proving priority by a preponderance of the evidence, Meitzner et al. have presented testimony and exhibits in an effort to establish that they conceived the invention of the count prior to March 9, 1957, and were reasonably diligent from immediately prior to that date until an actual reduction to practice shortly thereafter.

*The Invention of the Count*

The invention of the count is basically a process for the synthesis of styrene-divinylbenzene copolymers under specialized conditions which result in the copolymer product being recovered in the form of opaque beads having a sponge-like porosity. When styrene and divinylbenzene (DVB) are dissolved in at least a particular minimal amount of a solvent (also referred to as "diluent" and "precipitant") having the properties described in the count, and the resulting solution of monomer-in-solvent is dispersed in excess water, it forms a so-

called oil-in-water emulsion, i.e., the monomer-in-solvent phase forms minute droplets in the water. The polymerization of the suspended styrene and DVB then proceeds. It is believed that the styrene monomer forms linear polystyrene chains, and that the DVB acts as a cross-linking agent there-between. Since the solvent for the monomers is *not* a solvent for linear polystyrene, as the polymerization proceeds, the copolymer forms a separate solid phase within each suspended droplet. When the polymerization in a droplet is complete, there remains a bead having large "macropores" which are filled with the solvent. The solvent can be removed by several techniques not important here.

The single count reads:

2. A process which comprises (a) dissolving a major amount of styrene and a minor amount of divinyl benzene in an inert organic liquid which is a solvent for styrene but not for linear polystyrene, said inert organic liquid being selected from the group consisting of an inert aliphatic oxygen-containing solvent and an inert aliphatic hydrocarbon solvent, said solvent being present in an amount sufficient to impart a sponge-like porosity to the copolymer formed therein; (b) incorporating said solution into an excess of water to form a dispersion of droplets; and (c) copolymerizing said styrene and said divinyl benzene while suspended in said aqueous medium and in the presence of said inert organic liquid, the resultant copolymer being recovered in the form of opaque beads.

The beads obtained by the process of the count are unique in their porosity. The pores are very extensive in size and depth; such porosity is referred to variously as "macroporosity," a "macroreticular structure," and "a sponge-like porosity," all of which mean the same thing. Visually, these beads are always opaque; however, not all opaque beads are macroporous.

The beads may be converted into ion-exchange resins by chemically attaching either acidic or basic groups thereto. For example, if sulfonate groups are attached, the product can be used to soften water. The "macropores" preserved in the product are effective in removing large molecules from solutions treated with the resins.

### The Meitzner et al. Proofs

Meitzner testified to entering in his laboratory notebook a description of a process for the preparation of beads "for ion exchange resins having internal porosity." This entry (Exhibit M–1) was written on January 31, 1957.[1] The record indicates that shortly thereafter, the "concept" set out in Exhibit M–1 was discussed by Meitzner and Oline, and as a result Oline was asked to "reduce this concept to practice."

Sigafoos, a chemist working under the supervision of Oline, testified with respect to experiments conducted from February 11 to March 25, Exhibits M–7 through M–12 being the notebook records of these experiments. Meitzner et al. contend that the experiment of Exhibit M–12, carried out on March 14–15, in which *tertiary amyl alcohol* was used as a solvent with styrene and DVB in the preparation of resin beads by suspension polymerization constituted a reduction to practice of the invention of the count. It is also the position of Meitzner et al. that Exhibit M–1 establishes conception of the invention and that the activities of Oline and Sigafoos constitute reasonable diligence until the alleged reduction to practice.

The description contained in Exhibit M–1, which is entitled "Preparation of beads for ion exchange resins having internal porosity," reads, in pertinent part, as follows:

Suspension polymerized beads for ion exchange resin manufacture are to be prepared in the presence of a diluent for the monomer mixture, the diluent having a measured degree of hydro-

1. All dates hereinafter are in 1957.

philicity,[2] compatibility with the monomeric system but only limited compatibility with the polymer.[3] It [the diluent] should also not interfere drastically with the polymerization * * *. The water solubility should be such that desirable concentrations of the diluent may be maintained in the monomer mixture in contact with the aqueous phase.[4] As the suspended droplets of the monomer mixture undergo polymerization, assuming the diluent being less compatible with the polymer, a phase separation may occur and a diluent rich phase will form inside the bead distinctly separate from the polymeric phase. * * * Such beads may become opaque or translucent. * * * For example, in systems involving styrene monomer[5] acetone or other ketones, alcohols such as tert butyl alcohol or petroleum type solvents may [be] used.

As pointed out above, subsequent to the date of Exhibit M–1, Sigafoos carried out certain experiments recorded in Exhibits M–7 to M–12. The experiment of Exhibit M–7 (conducted February 11–13) is stated to have had as its purpose the determination of the solubility of various organic solvents in a styrene-15% DVB monomer mix; no polymerization was attempted in this experiment.

The purpose of the experiment recorded in Exhibit M–8 (conducted during the period from February 12 to March 13) is stated therein to have been to "test the effect" of ethyl alcohol on a styrene-15% DVB monomer system "for complete polymerization, porosity of the beads, and for comparison with toluene extended copolymers." This experiment, which constitutes the first attempt to reduce to practice the process described in Exhibit M–1, was unsuccessful inasmuch as only *clear* resin beads were obtained, indicating a lack of macroporosity. The experiment recorded in Exhibit M–9 was similar to that of Exhibit M–8, but normal butanol was employed as the diluent for the styrene–15% DVB monomer mixture; again the beads obtained were clear. Sigafoos also carried out a series of experiments (Exhibits M–10–A, –B and –C) using cyclohexane as a solvent in the preparation of beads from styrene–20% DVB mixture. Opaque beads were not obtained.

The record shows that Meitzner submitted a monthly report (Exhibits M–3 and M–3–A) entitled "Monthly Summary of Research for February 1957" which bears a date of March 11. This report includes a reference to work done by Oline and Sigafoos and was stated by Meitzner to refer to his "concept"

2. On direct examination Meitzner explained "hydrophilicity" and "a measured degree of hydrophilicity" as follows:
   Hydrophilicity means affinity for water; and I am speaking here of a measured degree of hydrophilicity. That means the water solubility should be subject to control.

3. On direct examination Meitzner testified:
   Q22. Now next you state that the diluent has "compatibility with monomeric system but only limited compatibility with the polymer." What do you mean by the term "compatibility" as used in this phrase? A. This means that a homogeneous solution of the monomers and the diluent is formed.
   Q23. "Only limited compatibility with the polymer"? A. This means that the

polymer is insoluble or nearly insoluble in the particular diluent.

4. On direct examination Meitzner testified:
   Q26. The next sentence is "The water solubility should be such that desirable concentrations of the diluent may be maintained in the monomer mixture in contact with the aqueous phase." What property of the diluent is being described in this sentence? A. The diluent should have a restricted water solubility.

5. On direct examination Meitzner testified:
   Q48. What is meant in this conception by the term "systems involving styrene monomer"? A. A styrene/divinylbenzene mixture, and particularly one which contains a major amount of styrene and a minor amount of divinylbenzene.

recorded in January (Exhibit M–1). This report states, in pertinent part:

An attempt was made to carry out the suspension polymerization of styrene/divinylbenzene copolymers in the presence of an additive which would cause the polymer formed to separate from the solvent/monomer mixture. This would furnish a heterogeneous bead containing both polymer and solvent rich locations and could constitute a path to macro porosity. Experiments in this direction, using added solvents such as butanol or cyclohexane have given clear beads, suggesting that the desired result was not achieved.

Oline testified that he was responsible for characterizing the beads referred to in the above report and further testified as follows (emphasis ours):

After discussing our previous results with Dr. Meitzner, *he suggested that if I had any ideas, to go ahead and try them.* I went to the library and looked up some information, a book on solvents * * * in a sense I tried tertiary amyl alcohol for two reasons: One, that I had worked with a company that had manufactured tertiary amyl alcohol and had had a little background in its properties; and then, in consulting the book, it seemed to further indicate that here was a material, a solvent, which had somewhat unusual properties in its relationship with water, water being soluble in it and it being soluble in water. For these two reasons, one of familiarity and one of property, I thought, well, this might be an interesting one to try. So that was the manner in which we arrived at the selection of tertiary amyl alcohol.

The precise date of Meitzner's suggestion that "if [Oline] * * * had any ideas, to go ahead and try them" and the date of Oline's decision to try tertiary amyl alcohol have not been established; it is not contended, however, that either was before the Corte et al. date of March 9. On March 14–15, Sigafoos, at the direction of Oline, conducted an experiment (recorded in Exhibit M–12) by which he prepared resin beads by the use of 35% tertiary amyl alcohol with styrene–20% divinylbenzene. With respect to this experiment, it is unnecessary for us to determine whether it was successful and constituted an actual reduction to practice of the invention of the count, as alleged by Meitzner et al.

### The Board Decision

The board's award of priority to Corte et al. was based on the holding that Meitzner et al. failed to establish a conception of the invention in issue prior to the Corte et al. effective date. In reaching this holding the board said, inter alia (emphasis ours):

*A conception of an invention involves not only a conception of the idea but also of the means for putting it into practice* * * *. Although * * * [Exhibit M–1] describes the process in which a diluent having certain properties may be employed we are of the opinion that the alleged conception does not include the means whereby the desired result may be achieved. * * * the record does not establish that the specific examples of diluents suggested in this exhibit are operative to obtain the intended effect. * * *

In this case it is apparent to us that at the time of the alleged conception Meitzner did not have in mind any diluent which would produce the desired porosity. In our opinion this view is strengthened by the testimony of Oline * * * that after the earlier experiments wherein opaque beads were not produced that he was told by Meitzner that if he (Oline) had any ideas to go ahead and try them, after which he selected tertiary amyl alcohol to be used in the experiment of Exhibit M–12.

*A conception is not complete merely because it can be read on the terms of the count.* Attention is directed to Raiche v. Foley, 27 CCPA 1380, 1940 C.D. 718, 113 F.2d 497 [46 USPQ 224], wherein the counts related to

the prevention of surface adhesion between coatings, the court stated * * *

> The counts do not specify any particular material to be inserted and subsequently dissolved out for producing this effect but, clearly, unless Foley had a conception of a practical material which would work successfully, conception in that regard was not complete.

We believe that the same reasoning applies here, as *the record does not establish that at the time of the alleged conception Meitzner had a conception of a practical material for his purpose.*

Viewing the case as it did, the board found it unnecessary to consider the question of diligence.

## Opinion

We agree with the board's decision and adopt as our own so much of the board's reasoning as has been quoted above. Appellants, however, raise two points which we feel we should treat.

First, appellants contend: "That Sigafoos did not immediately achieve positive results is immaterial." We cannot agree that this fact is "immaterial"; but we do feel that it does not necessarily establish that the description in Exhibit M–1 was legally inadequate as a conception [6]—it is just one fact that should be taken into consideration. However, the apparent inability of Meitzner and Oline, *the inventors*, to direct Sigafoos to a successful production of porous beads, after his initial failures, is in our opinion an entirely different matter. It convinces us, as it convinced the board, that appellants, jointly or individually, had not conceived of all the means necessary to effect the result desired. And, on this point, we agree with the board that Alpert v. Slatin, 49 CCPA 1343, 305 F.2d 891, 134 USPQ 296 (1962), is applicable here at least to the extent that the court there

adopted the following statement by the board:

> Conception of an inventive process involves *proof of mental possession of the steps of an operative process* and, if necessary, of means to carry it out to such a degree that nothing remains but routine skill for effectuation thereof. If after the claimed conception date extensive research was found necessary before achieving minimum satisfactory performance obviously the mental embodiment of that date was a mere hope or expectation, a statement of a problem, but not an inventive conception. [Emphasis ours.]

Appellants also maintain that Exhibit M–1 refers specifically to a diluent which is *in fact* operative, *tert*-butyl alcohol, that the board unjustifiably challenged the operability of *tert*-butyl alcohol, and that the board erred in refusing to consider evidence presented, with appellants' Request for Reconsideration before the board, to establish operability of *tert*-butyl alcohol. However, even were we to consider the evidence just mentioned and were we to be led by it to conclude that *tert*-butyl alcohol *can* be used successfully in a process encompassed by the count, that would not establish that appellants conceived *how* *tert*-butyl alcohol could be so used prior to appellees' effective date. To explain, appellants' specification teaches the following (emphasis ours):

> A minimum concentration of any particular precipitant is required to effect phase separation. * * *
>
> * * * * * *
>
> * * * In the case of *tert*-amyl alcohol and *sec*-butanol, the need for higher precipitant concentrations as the amount of cross-linking decreases is clearly evident. * * * *there is a definite concentration of precipitant below which no phase separation occurs; and, without phase separation, the unusual and desirable properties*

---

6. Cf. Trumbull v. Kirschbraun, 21 CCPA 758, 67 F.2d 974, 20 USPQ 46 (1933).

*of the products of this invention are not obtained.*

\* \* \* \* \* \*

When suspension copolymerizing monomers, an additional factor must be considered, namely the solubility of the precipitant in the suspending medium. Since suspension polymerization of most ethylenically unsaturated monomers is generally conducted in aqueous media, most frequently it is the water-solubility of the precipitant which must be considered. While precipitants with water-solubilities as high as 15 to 20 grams per 100 grams of water can be employed, a low water solubility is preferred because of handling ease, ease of recovery, and processing economies. As is well-known, however, it is possible to decrease the water-solubilities of compounds by adding salts to the aqueous phase. This method also may be employed to decrease the water-solubilities of the precipitants utilized so significantly in the present invention.

\* \* \* \* \* \*

\* \* \* The quantities of alkanol required are from about 30% to about 50% of the weight of the monomer mixture and the alkanol *with the least amount of precipitant being required at the highest percentage of cross-linking.*

Thus, to successfully employ the process of the count, one must use a minimum critical amount of diluent, this amount varying with the particular diluent and with the amount of cross-linking agent in the monomer mixture. It is also evident that water-solubility of the diluent is of extreme importance, it being necessary to add salts to the aqueous phase if the solubility of the diluent in water exceeds certain values. If these parameters are taken into account, *tert*-butyl alcohol apparently can be used to obtain porous beads according to the process of the count. But, what we find lacking in the Meitzner et al. proofs relating to conception is a recognition of the importance of these parameter and a recognition of how these parameters must be varied to render a given diluent useful. In other words, we find lacking in appellants' proofs a recognition of the means by which the process of the count could be put into practice.

The decision of the board is affirmed.

*Affirmed.*